A04A1553. KESCO, INC. v. THE BRAND BANKING COMPANY.

(603 SE2d 49)

BLACKBURN, Presiding Judge.

In this case regarding a dispute between two holders of liens on the same tract of real property, Kesco, Inc. appeals the trial court's grant of summary judgment in favor of The Brand Banking Company (the Bank) on Kesco's claims for breach of contract, promissory estoppel, and fraud. On appeal, Kesco contends that the trial court erred by finding that the Bank had not entered into a binding contract with Kesco which absolutely prevented it from foreclosing its first mortgage on the property without first paying Kesco an agreed-upon amount to satisfy its lower-priority lien. For the reasons set forth below, we affirm.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

Matjoulis v. Integon Gen. Ins. Corp.[1]

Viewed in this light, the record shows that Johnny Tumlin Development Company (Tumlin) intended to develop a certain plot of real property into a residential subdivision known as Creekside Estates. To acquire the property and finance construction, Tumlin received a $1.5 million loan from the Bank. The promissory note was secured by the real property being developed by Tumlin.

After receiving this loan, Tumlin began work on the subdivision and hired Kesco to perform drilling and rock blasting work on the

---

[1] Matjoulis v. Integon Gen. Ins. Corp., 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

property. In 1999 and 2000, Kesco performed $88,914.72 worth of services on Tumlin's property. Some time thereafter, however, Tumlin exceeded its budget on the development and informed Kesco that it would not be able to satisfy Kesco's bill. In response, Kesco filed a materialman's lien on the property for the full amount of its bill on August 28, 2000.

Later that same year, Tumlin attempted to sell its first few completed lots in the subdivision; however, at closing, it was discovered that Kesco, along with several other of Tumlin's subcontractors who had not been paid for their services, had filed materialman's liens against the property. As a result, the sales of these lots could not be closed because the amount of the liens exceeded the purchase price of each lot.

At this point, the existence of the liens was reported to the Bank, whose mortgage had first priority over all other lienholders. Faced with this situation, the Bank determined that it had two viable options: (1) it could foreclose on the property, thereby receiving payment for its loans and wiping out the lower-priority liens of the subcontractors or (2) it could attempt to marshal some agreement with the other lienholders which would allow all of them to be paid at least some amount on each sold lot in exchange for the lienholders' removal of their liens prior to the closing of each sale. Initially, the Bank chose the latter option because it was interested in keeping a good reputation with subcontractors in the community, thereby increasing its goodwill value.

The communications between the Bank and Kesco regarding their "repayment strategy" are contained in several letters. On November 13, 2000, the Bank sent a letter to Kesco stating: "There are 60 lots in the first phase of Creekside Estates Subdivision that Johnny Tumlin is developing. We propose that you take $1,100 per lot for the first 48 lots and $3,011.72 per lot for the remaining 12 lots." On the same day, Kesco responded: "[T]he terms you offer are unacceptable. Our total account with Mr. Tumlin now stands at nearly $100,000.00. Accordingly, we will accept $5,000.00 per lot for the first 20 lots." Still on the same day, Kesco sent a second response to the Bank, stating: "I have spoken with Ms. Deloris Baker at Baker Woods. Both of our companies want to work with Brand Banking to bring this situation to resolution. . . . We ask that you please consider our offer of $1,660 per lot for each of the 60 lots." In a November 14, 2000 response, the Bank stated: "This is to confirm that the Brand Banking Company will accept your offer to release your lien on the Creekside Estates Subdivision for $1,660 per lot for each of the 60 lots. At this time, Mr. Tumlin has stated to us that he has commit-

ments on twelve lots, but we have been contacted for payoffs on five lots."[2]

Thereafter, from November 2000 to May 2001, 11 lots in Creekside Estates were sold, and from each sale Kesco received $1,660, the other lienholders received their agreed-upon allocations, and the Bank received the remainder of the funds otherwise allocated to Tumlin.

After May 2001, however, Tumlin informed the Bank that it had far exceeded its budget for completing the subdivision. As a result of this increased debt on the subdivision, the Bank determined that there would be no way to remunerate all of the lienholders on the property at the level to which they had voluntarily agreed, and the Bank decided to foreclose its mortgage. As a result of this foreclosure, Kesco received no further payment for its blasting work.

Based on these facts, Kesco now contends that the Bank breached a contract in which it allegedly promised not to foreclose on the property under any circumstances. The facts of record, however, do not support this contention, as there is no evidence indicating that the Bank promised not to foreclose under any circumstances. It is undisputed that, at all times, the Bank maintained a superior lien on the property and could have destroyed Kesco's lien at any point via foreclosure. It is further undisputed that, at the time that the agreement between the lienholders was reached, it was based on an assumption that all 60 lots in Creekside Estates would be developed successfully and would generate a certain amount of revenue. At the time the Bank foreclosed, Tumlin was operating at a net loss such that the completion of the subdivision was no longer possible and any future sales would not generate enough income to pay off existing lienholders even at their reduced amounts. At no time did the Bank promise not to foreclose under any circumstances; it simply promised to pay certain funds to Kesco if and when properties were successfully developed and sold and Kesco removed its lien. The agreement extended no further.

In light of these facts, we cannot say that the trial court erred in granting summary judgment to the Bank.

*Judgment affirmed. Barnes and Mikell, JJ., concur.*

DECIDED JULY 16, 2004 —
RECONSIDERATION DENIED AUGUST 3, 2004.

*Anderson Dailey, Mark Ford*, for appellant.

---

[2] Similar agreements were reached with the other lienholders.

*Andersen, Tate, Mahaffey & McGarity, Thomas T. Tate,* for appellee.